UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BETTY HALPERIN,           )
                          )
        Plaintiff,        )
                          )
    v.                    )
                          )  No. 04 C 7314
ANTHONY DELUCA, DAN PROFT,)
and CITY OF CHICAGO HEIGHTS,)
a municipal corporation,  )
                          )
        Defendants.       )
                          )

# MEMORANDUM ORDER AND OPINION

MARVIN E. ASPEN, District Judge:

Presently before us is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff Betty Halperin alleges that Anthony DeLuca, Dan Proft, and the City of Chicago Heights ("City" or "Chicago Heights") (collectively, "Defendants") fired her for political reasons after DeLuca became mayor. Defendants, on the other hand, contend that Halperin was terminated along with other City employees as part of the new administration's efforts to reduce the City's payroll. For the reasons set forth below, we grant Defendants' motion.

## SUMMARY OF THE FACTS[1]

In late 2002, Angelo Ciambrone ("Ciambrone"), the mayor of Chicago Heights, decided not to seek another term in the 2003 mayoral election. (Defs.' Facts ¶ 20.) Several candidates entered the race, including Paulnita Rees (one of Ciambrone's advisors), David Zerante and Anthony DeLuca. (*Id.* ¶¶ 20-21.) The city's financial crisis was an issue in the campaign. (*Id.* ¶¶ 49-59.) During Ciambrone's administration, "employees' salaries and benefits was one of the

---

[1]Unless otherwise noted, the facts described herein are undisputed.

1

major expenses of the City." (*Id.* ¶ 38.) Indeed, "health care costs were rising dramatically and were 'killing' the City." (*Id.* ¶ 39.) All candidates acknowledged that reductions to the City's payroll would be necessary to ensure financial stability. (*Id.* ¶ 53.) As the top two finishers in the primary, Zerante and DeLuca participated in the April 2003 general election, which DeLuca won. (*Id.* ¶¶ 2, 25.)

Shortly after the election, DeLuca terminated Rees and placed his campaign manager, Dan Proft, in a chief of staff position.[2] (*Id.* ¶¶ 62-63.) As DeLuca prepared to take office, Proft predicted a $4 million deficit for the 2003-2004 fiscal year. (*Id.* ¶¶ 60-61.) Once sworn in, DeLuca immediately began to terminate City employees. (*Id.* ¶ 68.)

Halperin began working for Chicago Heights in April 1989. (*Id.* ¶ 111.) As a secretary for the Planning and Zoning Department, her "responsibilities included answering phones, preparing documents for meetings, scheduling meetings, drafting and typing correspondence, and placing notices of meetings in local newspapers." (*Id.* ¶ 112.) In early 2004, Halperin was notified of her termination, and her last day on the payroll was February 27, 2004. (*Id.* ¶ 113.) Proft informed Halperin that the administration was eliminating her position. (*Id.* ¶ 115.) Other existing City employees, including Stephanie Chaney, absorbed Halperin's job duties. (*Id.* ¶¶ 116-118.) No one told Halperin that political reasons motivated her termination. (*Id.* ¶ 119.)

In 1999, Halperin assisted Ciambrone in his reelection campaign by working at his headquarters on three or four occasions. (Pl.'s Facts ¶ 363, Ex. 6, Halperin Dep. at 80.) She stated that she did not work at DeLuca's headquarters during his campaign. (*Id.* ¶ 354.) Moreover, Proft did not recall seeing her at DeLuca's headquarters. (*Id.* ¶ 332.) According to Halperin, she volunteered for DeLuca's opponent, David Zerante, three times during the 2003 campaign. (Pl.'s Resp. to Defs.' Facts ¶ 283.) Halperin admits that "neither Proft nor DeLuca knew whom she supported or voted for in the 2003 election." (*Id.* ¶ 281.) Nonetheless, she

---

[2] Proft resigned in March 2004, and Tom Planera replaced him as DeLuca's Chief of Staff. (Defs.' Facts ¶ 205.)

claims that she was fired for political reasons because she feels the DeLuca administration knew she "was not supportive of him and . . . was not supportive of the Republican Party prior to him running for election." (Pl.'s Facts ¶ 365.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56©. A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255. Finally, "[w]e apply the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Michas v. Health Cost Controls of Illinois, Inc*., 209 F.3d 687, 692 (7th Cir. 2000) (*citing Bellaver v. Quanex Corp*., 200 F.3d 485, 491 (7th Cir. 2000)).

## ANALYSIS

With certain exceptions not relevant here, "hiring, firing, or transferring government employees based on political motivation violates the First Amendment." *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004); *see Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir. 1998). To make out a *prima facie* case, Halperin must demonstrate that her conduct (1) was constitutionally protected

3

and (2) "was a substantial or motivating factor" in the decision to terminate her. *Hall*, 389 F.3d at 762; *see Nelms*, 153 F.3d at 818; *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992). The Seventh Circuit has observed that this burden "is not insignificant. A disgruntled employee fired for legitimate reasons would not be able to satisfy [her] burden merely by showing that [she] carried the political card of the opposition party or that [she] favored the defendant's opponent in the election." *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981); *see also Nelms*, 153 F.3d at 818. If Halperin makes such a showing, the burden then shifts to Defendants to prove they had a legitimate, non-political reason for terminating her. *Hall*, 389 F.3d at 762; *Nelms*, 153 F.3d at 818; *see Garrett*, 961 F.2d at 662 (stating that the defendant must "prove by a preponderance of the evidence that [plaintiff] would have been terminated even without political considerations").

### A. Defendants' Knowledge of Halperin's Political Affiliation

As the parties agree that Halperin's support of a particular mayoral candidate was constitutionally protected, we need not discuss the first prong of the *prima facie* case. *See also Garrett*, 961 F.2d at 632 (noting that the First Amendment protected plaintiff's "endorsement of and support for" mayor's campaign). Turning to the second prong, we consider whether Halperin's political affiliation was a substantial or motivating factor in Defendants' decision to terminate her employment. For Halperin to prove that her political beliefs motivated Defendants, she "must first prove that [Defendants] in fact knew of them." *Id.*; *Nelms*, 153 F.3d at 819*; see Hall*, 389 F.3d at 762 (commenting that the "threshold question is whether the defendants even knew about" plaintiffs' activities). Indeed, DeLuca and Proft could not have fired her based on her political beliefs unless they actually knew that she supported Zerante or did not support DeLuca. *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992); *Winkelman v. Magne*, 173 F. Supp. 2d 821, 825 (C.D. Ill. 2001) ("The law is clear that, if a defendant does not know of a plaintiff's political affiliation (or lack thereof), he cannot be held liable.").

4

Here, however, Halperin provides no evidence that DeLuca or Proft in fact knew who she supported, or did not support, during the 2003 mayoral campaign. To the contrary, she admits that "neither Proft nor DeLuca knew whom she supported or voted for in the 2003 election." (Pl.'s Resp. to Defs.' Facts ¶ 281.) Further, she fails to offer evidence explaining how DeLuca or Proft might have learned about her political beliefs. Although she worked at Zerante's headquarters on three occasions, she does not claim that anyone in the DeLuca administration observed or otherwise learned about her activities. She never had a personal conversation with DeLuca, and no one in his administration indicated to her that they knew who she supported in 2003. (*Id.* ¶¶ 282, 285.) Halperin has not produced a single witness who was aware of her political affiliation or activities during the 2003 mayoral campaign. (*See id.* ¶¶ 287-297a) (admitting that Paulnita Rees, Robert Boehl, Stacie Foster, Rita Starkey, Rachel Vega, Licia Alcazar, Debra Stewart, Maria Zerante, Angelo Ciambrone, and Jeff Vanderbok had no personal knowledge of her political beliefs).

Lacking any evidence, Halperin speculates that DeLuca and Proft knew she did not support DeLuca because she did not work at his headquarters. (Pl.'s Mem. of Law in Resp. to Mot. for Summ. J. at 6-7.) In an effort to raise an inference of politically-based firings, she identifies other Chicago Heights employees – Maria Zerante, Licia Alcazar and Debra Stewart – who allegedly did not volunteer for DeLuca and who were also terminated.[3] (*Id.*) Nonetheless, the record does not confirm that Zerante, Alcazar and Stewart did not work for DeLuca's campaign. Unlike Halperin, these women did not testify that they never volunteered at DeLuca's headquarters. Rather, DeLuca and/or Proft did not recall whether they *saw* these three

---

[3]Halperin also claims that several people who worked at Paulnita Rees' campaign headquarters were terminated. (Pl.'s Mem. of Law in Resp. to Mot. for Summ. J. at 7.) We agree with Defendants that this evidence is irrelevant in this particular case because Halperin did not volunteer for Rees. (Defs.' Reply at 3-4.) It might be reasonable to infer that DeLuca or Proft learned about the activities of Rees' supporters because DeLuca's headquarters was located in the same shopping center as Rees'. *See Foster v. DeLuca*, No. 04 C 5850, 2006 WL 1980197, at *5 (N.D. Ill. July 7, 2006) (Norgle, J.) (denying defendants' summary judgment motion). (Pl.'s Facts ¶ 344.) It is not reasonable, however, to infer that DeLuca or Proft learned about Halperin's activities at *David Zerante's* headquarters in the absence of similar evidence.

5

employees at campaign headquarters. (Pl.'s Facts ¶¶ 331 (Stewart), 333 (Zerante); Defs.' Facts, Ex. 17, DeLuca Dep. at 36 (Stewart), 42 (Alcazar).) Even if the evidence supported Halperin's allegations, she relies on no more than a "blurry assumption" that DeLuca and Halperin knew of her political beliefs. *Cusson-Cobb*, 953 F.2d at 1081 (requiring plaintiff to show more than a "blurry assumption" that defendant knew her affiliation to withstand summary judgment). Without more – without any evidence of "a causal connection between [her] political association or activities and the hiring decision" – Halperin fails to make out a *prima facie* case. Because Halperin identifies no genuine issue of material fact as to whether DeLuca and Proft knew of her beliefs, she cannot survive summary judgment.

### B. Defendants' Legitimate, Non-Political Explanation

Even if Halperin presented a *prima facie* case of politically-motivated termination, Defendants demonstrated a legitimate, non-political reason for their decision to fire her. *Hall*, 389 F.3d at 762; *Nelms*, 153 F.3d at 818. The undisputed record establishes that Chicago Heights experienced a serious financial crisis prior to and after the 2003 mayoral election. (Defs.' Facts ¶¶ 38-59.) Halperin knew about the ongoing financial problems, which the mayoral candidates addressed in the 2003 campaign. (*Id.* ¶¶ 49, 57.) Each of the candidates stressed that payroll reductions would be necessary to help resolve the financial crisis. (*Id.* ¶ 53.) DeLuca, in particular, felt the deficit was caused by "a large number of employees, employees with duplicative jobs, and too much [tax-exempt] commercial property." (*Id.* ¶ 67.) Against this backdrop, Proft informed Halperin in early 2004 that the administration was eliminating her position. (*Id.* ¶ 115.) She received no indication that politics motivated her termination. (*Id.* ¶¶ 119, 285.) Halperin was not replaced, as no single employee absorbed all of her responsibilities; rather, various City employees took over her duties.[4] (*Id.* ¶¶ 116-118.) Given this

---

[4]Halperin seems to make much of the fact that Stephanie Chaney, the secretary for DeLuca's Chief of Staff, was transferred to the building department and took over certain tasks previously completed by Halperin. (Pl.'s Resp. to Defs.' Facts ¶¶ 114, 118, 300.) It is unclear how Chaney's transfer and added responsibilities bolster Halperin's case, particularly as Chaney also did not support DeLuca during the campaign. (*See id.* ¶ 298) (stating that Chaney supported

6

uncontroverted evidence, we conclude that Defendants have shown a legitimate, non-political reason – payroll reductions due to budget constraints – for Halperin's termination. *See Nelms*, 153 F.3d at 818 (concluding that defendants' departmental restructuring was a non-political reason for termination decision).

Moreover, Halperin has not presented evidence casting any doubt on Defendants' stated reason for her termination. She contends that "if Mayor DeLuca's priority was not to fire people he believed were tied to Democrats, he could have transferred Plaintiff to another department such as the clerk's office or the police department instead of hiring people, who had supported his campaign, for each of these departments." (Pl.'s Mem. of Law in Resp. to Mot. for Summ. J. at 7-8.) First, as discussed earlier, Halperin has not shown that DeLuca and Proft believed she was tied to the Democratic party. Second, Halperin has not presented evidence that she was suitable for available positions in other departments at the time her job was eliminated.

Third, the record does not support her argument that individuals supportive of DeLuca were hired into the clerk's office or police department in lieu of Halperin. For example, the parties' statements of fact indicate that the DeLuca administration terminated two employees from the police department, Licia Alcazar and Debra Stewart, and one employee from the clerk's office, Emily Garcia. (Defs.' Facts ¶¶ 68, 178, 180, 192.) Based on our review of the parties' statements, Halperin claims that after DeLuca became mayor, he hired three new employees – Glenda Gray, Nancy DiGiovanni, and Michelle Smado – into the police department. (*Id.* ¶¶ 68, 225; Pl.'s Facts ¶¶ 337, 356-358.) She further claims that Kaz Rosetto and Christine Popolla were hired into the clerk's office. (Defs.' Facts ¶¶ 68, 97, 193; Pl.'s Facts ¶¶ 350, 355.) Assuming these facts are true,[5] the record is nonetheless silent on whether Gray, DiGiovanni,

---

Rees in the primary election and Zerante in the general election.)

[5]Although Defendants contest certain factual assertions regarding these new hires, there is no genuine issue of material fact relevant to Halperin's arguments or otherwise precluding summary judgment. (*See*, *e.g.*, Defs.' Resp. to Pl.'s Facts ¶¶ 337, 350, 355-358.)

Smado, Rosetto and Popolla supported DeLuca in the 2003 election.[6] In light of the above, we cannot draw the inference that Halperin perhaps could have been transferred to these other departments but for DeLuca's desire to reward his political supporters.[7]

## CONCLUSION

For the reasons set forth above, we hereby grant Defendants' motion for summary judgment and terminate this case.[8] It is so ordered.

 Honorable Marvin E. Aspen
 U.S. District Court Judge

Dated: August 10, 2006

---

[6]The record indicates only that Popolla, Rosetto, and Smado did not work for, or financially support, the Rees campaign. (Defs.' Facts ¶ 317.)

[7]We note that DeLuca and Proft were not obligated to retain any particular staff members from the Ciambrone administration. In order to avoid liability, they need not prove that it was their "priority . . . not to fire people" they believed were Democrats. (Pl.'s Mem. of Law in Resp. to Mot. for Summ. J. at 7-8.) Halperin "could be fired for a good reason or for no reason at all, as long as [she] was not fired because of [her] constitutionally protected activities." *Garrett*, 961 F.2d at 633.

[8]In light of our decision, and as we did not consider the disputed document, we also deny Defendants' Motion to Strike Affidavit of Patty Rose as moot.